THE CITY OF YORK, PLAINTIFF IN ERROR, v. CATHERINE SPELLMAN, DEFENDANT IN ERROR.

1. **Instructions to Jury.** For reasons, set out at length in the opinion, instruction number 5; *Held*, Inapplicable to the evidence, and erroneous.

2. **Municipal Corporations:** INJURIES ON ACCOUNT OF DEFECTIVE SIDEWALKS. In an action against a city for an injury sustained by the plaintiff by reason of a defective cross-walk, it is incumbent upon the plaintiff to prove on the trial that such defect existed in the original construction of the cross-walk by or under the authority of the city; that the city, through its proper authorities, had notice of the defect which caused the injury; or facts from which notice thereof may reasonably be inferred; or circumstances, from which it appears that the defect ought to have been known and remedied by the city.

3.  ———:  ———:  TRIAL:  EVIDENCE.  For reasons given at
    length in the opinion; *Held*, That the trial court erred in with-
    drawing from the jury the testimony of the witness therein
    named as to the dimensions of the wooden structure of the
    cross-walk alleged to have been the cause of the injury, as as-
    certained by measurement two years after the date of the in-
    jury.

ERROR to the district court for York county.  Tried be-
low before NORVAL, J.

*Sedgwick & Power*, for plaintiff in error.

*Scott & Gilbert*, for defendant in error.

COBB, J.

The substantial allegations of the plaintiff's petition in
the court below are as follows: "That before the hap-
pening of the grievances hereinafter mentioned, the de-
fendant had constructed a cross-walk, composed of lum-
ber, on (said) Sixth street, at the crossing or junction of
York Avenue street in an improper and negligent manner
by leaving the surface or top of said cross-walk at a great
elevation above the natural surface of the street or ground,
and without making or causing to be made any gradual
approach thereto for the passage of vehicles across or over
said cross-walk; and kept and maintained said cross-walk
in such condition until the happening of the grievances
hereinafter mentioned.  That on or about the 10th day of
January, 1880, the plaintiff and Seymour Spellman were
driving with team and wagon on said York Avenue street,
using ordinary care and precaution, and in driving over
said cross-walk the striking of the wheels of said wagon
against the abrupt sides of the said cross-walk, so as afore-
said improperly and negligently kept and maintained, was
of such force as to cause the plaintiff to be thrown vio-
lently out of said wagon and to the ground, without any

City of York v. Spellman.

fault or negligence on the part of the plaintiff or of the driver of the said team, or any occupant of said wagon, whereby she, the said plaintiff, received great bodily harm and injury, and was · made sick and sore, and was permanently injured and lamed ; and has ever since said time, in consequence of said injuries been prevented, from attending to her business, or from performing any services whatever; and was kept to her bed for a long period of time, and has expended large sums of money for medical attendance and medicines, in the sum of $200, and has been damaged in the sum of five thousand dollars," etc.

Of the above allegations the defendant by its answer, admitted that it caused a cross-walk to be constructed at the crossing of said streets on Sixth street, and across York avenue, and that the plaintiff and Seymour Spellman drove a team and wagon over said cross-walk at or about the time alleged; but the defendant alleged that the said cross-walk was properly constructed of good material and with suitable approaches; and that said cross-walk was not constructed in an improper or negligent manner; and that the said plaintiff was thrown out of said wagon, as she has in her petition alleged, of her own fault and negligence, and not for the reason alleged in her said petition; and defendant denied each and every other allegation of said petition.

The cause was tried to a jury, which found for the plaintiff, and assessed her damages at the sum of $800. A judgment being rendered thereon, after a motion for a new trial had been overruled the cause was brought to this court on error.

There are thirteen assignments of error, as follows:

" 1.   The verdict is not sustained by sufficient evidence;

" 2.   The verdict is contrary to law;

" 3.   The damages are excessive, appearing to have been given under the influence of passion and prejudice;

"4.   The court erred in giving instruction number two on its own motion;

"5.   The court erred in giving instruction number three on its own motion;

"6.   The court erred in giving instruction number five on its own motion;

"7.   The court erred in giving instruction number eight on its own motion;

"8.   The court erred in giving instruction number sixteen on its own motion;

"9.   The court erred in refusing to give instruction number one of instructions prayed by the defendant;

"10.   The court erred in admitting evidence offered by the plaintiff over the objections of the defendant;

"11.   The court erred in ruling out evidence offered by the defendant;

"12.   Other errors, etc.;

"13.   The court erred in overruling defendant's motion for a new trial."

The plaintiff being called as a witness in her own behalf, testified: On the 10th day of January, 1880, she received an injury at the corner of Sixth street, in the city of York; that she was riding at the time the accident occurred in a two-seated buggy; that Mr. Spellman, her husband, was driving and sitting on the front seat; that she, plaintiff, her son's wife and her son's little girl, a child about two years old, were sitting on the hind seat; no one else was sitting with Mr. Spellman on the front seat. For greater accuracy I quote her testimony:

Q.   Well, you may state to the jury how the accident occurred, how you came to be hurt?

A.   Well, we were about coming over that crossing on Sixth street, and Mr. Spellman said there was some one rode along back of us, and spoke to his horse.

Objected to.

We were about to go over the crossing, and the first

thing I knew we were thrown out as we were passing over it; I do not know anything about the others myself.

Q. Immediately afterwards where did you find yourself?

A. At Mr. Reed's.

\* \* \* \* \* \*

Q. Where did you fall when you went out of the buggy? Did you fall on the ground—which way did you fall—up or down?

A. We were going north.

Q. Which way did you fall when you went out of the buggy?

A. Backwards.

Q. Where did you fall?

A. The seat went out with me and we went with the seat.

Q. Did you fall upwards or downwards?

A. We fell backwards.

Q. Just relate the circumstances, as you understand it.

A. The way I got injured or hurt was falling.

Q. What did you fall on to?

A. Well, I fell across the seat; I did not get out of the seat; it was a high-back seat.

Q. You say you received injuries. What portion of your person was injured?

A. My hip and back.

Q. Do you know how you happened to get into Mr. Reed's house?

A. No.

Q. Why don't you know that?

A. Because I was not conscious, I suppose, and did not know.

Q. What has been your condition since that time?

A. I have been so as to walk on crutches or wheel a chair around the house.

Q. Can you walk without a crutch?

A.   No, sir.

Q.   Well, can you tell the jury the cause of the accident, how you happened to fall out?

A.   It was the crossing was not properly graded up.

Q.   Do you know what was the immediate cause of your falling out of the buggy?

Defendant objected as improper.

Overruled.   Defendant excepts.

A.   It was the walk that caused the accident, the cross-walk not being graded up.

Defendant moved to strike out the above answer.   Sustained.

Q.   Explain how?

A.   It was a bad crossing.

Q.   You need not give your opinion about it.   If you know anything about the condition of it when you went over it, what occurred when you went over it; what occurred to the buggy?

A.   Why the seat, as it struck the crossing——

Q.   As what struck the crossing? .

A.   As the buggy struck the crossing; when the forward wheels of the buggy struck it knocked the seat loose, and I fell out.

Defendant moved the court to strike out all of the above answer in relation to how the accident occurred.

Overruled.   Defendant excepts.

Q.   State to the jury how Mr. Spellman was driving.

A.   He was driving slow, almost on a walk.

&ast;        &ast;        &ast;        &ast;        &ast;        &ast;

Q.   Had you ever examined this cross-walk before this time?

A.   No, but I had passed over it.

Q.   Did you ever examine it afterwards?

A.   No, sir.

Upon her cross-examination the plaintiff testified as follows:

&ast;        &ast;        &ast;        &ast;        &ast;        &ast;

Q.  Well, you say you were not driving very much faster than a walk.  What kind of a trot were your horses going on?

A.  They were not trotting.

Q.  What were they doing?

A.  They were going slow; we were almost crossing.

Q.  It was not a walk, you stated.

A.  Not exactly.

Q.  Well, what was it, then?

A.  It was going real slow.

Q.  Was it a trot?

A.  No, sir.

Q.  I understand you to say on your direct examination that they were not going much faster than a walk?

A.  They were not going faster; they were going moderate.

Q.  Do you know whether the horses were going faster than a walk or not?

A.  No, they were not, I do not think; I was not driving, and could not tell.

Q.  I want to know whether the team was going faster than a walk just before this accident occurred?

A.  I could not say, but was driving slow, and I know was not driving fast.

Q.  You do not know what started up the team?

A.  No, I do not.

Q.  Mr. Spellman did not strike them with a whip, did he?

A.  No, sir; we did not carry a whip.

Q.  How far were they from the crossing when they started up?

A.  They were almost crossing or just about going over.

Q.  The team was just about going over the crossing when they started up, were they?

A.  Yes, sir.

Q.  About how far were they from it?

A. I do not know how far; they were just on the street that comes east and west going over that crossing.

Q. The team were about the distance of half way across Sixth street from the crossing—is that your answer?

A. I do not know; we were pretty close to the crossing, but I could not tell just how near.

Q. I do not expect you to give the exact distance, but there is a difference between a rod and a mile, and we want some idea?

A. We were pretty close to the crossing.

Q. About how far, some people would call a rod pretty close, and some would call ten rods close?

A. We were right on the street that goes east and west, and right near the crossing.

Q. That is, you came along from the south, and the horses had just about got to the middle of the street that goes east and west when they started up. Is that it?

A. They were pretty close to the crossing, I could not tell just how many feet.

Q. Is that what you mean to say, to the best of your recollection, that the horses had just about got to the middle of the street that goes east and west, when they started up?

A. I think it was a little nearer than the middle of the street, but I am not positive about that.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. You do not know of your own knowledge whether any one just at that time came along on horseback or not?

A. No, sir.

Q. Nor whether that was what started up the team or not?

A. No, I do not. The first I knew I went to grab hold of something when the seat started and I fell out.

Q. Well, which way did the seat start?

A. To one side, it started up when the forward wheels struck; and when the hind wheels struck we went out on the ground, seat and all.

Q. · Did the seat start backwards or forwards?

A.   It went back; it fell out backwards.

Q.   The first you noticed that there was anything going wrong was the seat started to go back?

A.   Yes, sir, and as it started I reached for something to get hold of.

Q.   Did the others that were in the seat with you fall out also?

A.   Yes, sir, those that were on the back seat.

Q.   You all went out together?

A.   Yes, sir, my son's wife and little girl, and me.

Seymour Spellman, a witness called by the plaintiff, testified: That the plaintiff is his wife; that at the time she received the injury spoken of by her, she, together with the wife and little girl of witness's son, were in the wagon with witness, and witness was driving. I quote in part, his further testimony.

Q.   Just relate to the jury, commencing at the time you struck that street where the accident occurred, the circumstances?

A.   Well, we started to come up to my daughter's, who lived a little west and north of there. After crossing the bridge we struck an angling road straight up 5th street, and we took that road and angled off past where the old grist mill stands, and came along about to where Hesser now lives, on York avenue, and we were passing quietly along until we were crossing 6th street, and there was a man came from towards town, riding a horse, and I just noticed him, and thought he would not interfere with me, and just as he passed behind the wagon he struck his horse with something, either a whip or a halter, and says sharp to him, "get up," and my horses was opposed to that, and they sprang, and was so near the walk that the wheel struck, it made the buggy bound up, and when it struck again the seat broke loose, and dropped onto the ground.

\*        \*        \*        \*        \*        \*

Q. Explain to the jury how you were driving?

A. Why, I was driving at a moderate rate, as we usually go, I do not know whether the horses had got down to a walk, but I know it was very slow, as we were approaching the cross-walk, until he struck his horse, then they jumped.

Q. How did you handle them?

A. I had them under control, as I always have. It was a quiet team. One of them was 16 years old, and she knew very well how to behave.

Q. Explain to the jury the condition of that crossing?

A. Well, I thought it was about a new crossing. It never had been graded up, but lay on the top of the ground.

Q. Can you explain the construction of the walk?

A. Well, yes, sir, somewhat.

Q. Just explain as near as you can?

A. It perhaps was something in that shape (witness shows with two books), with stringers inside here, to go across of the usual style of 2x6 ties, and plank on top, and then this piece set on an angle.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Q. You were going north, were you?

A. Yes, sir.

Q. How about the surface of the ground from here south?

A. It was lower as you went south from it, where the water had washed in there. I think the water runs from the west to the east, and it made the ground a little lower, on this side it was not graded up at all, and on the north side, a little way from it north, there was a place where water had stood in the road.

Q. Explain to the jury, as near as you can, just how the wheels struck the approach plank, from the top of the walk down to the ground, what was the thickness of it?

A. Two inch plank.

Q. Explain to the jury how your buggy wheels struck the plank approach?

A. They would strike here, of course (witness illustrates with books).

Q. Whether at the top, or at the bottom, or in the center?

A. They would naturally strike towards the bottom.

Q. How did the buggy act after the fore wheels struck the buggy? (sic!)

A. That would throw the forward end up, and it did throw it up; and when the hind wheels struck it, it threw it more, and it passed from under the seat.

Q. Where did Mrs. Spellman fall to?

A. She dropped just north of the walk on the ground. The momentum of the buggy received from the jump threw the buggy from under the seat, and broke it loose, and threw the seat out.

Upon cross-examination, among other things the witness testified as follows:

Q. Did you see just how the women fell?

A. Yes, sir, I know how they were when they struck the ground.

Q. I mean when they fell out of the buggy. Did you notice them or were you looking at the horses?

A. I could not say which way I was looking.

Q. You cannot say whether you saw them start to fall or not.

A. No, sir.

Q. So, of course, you do not know which way they first fell?

A. I know they fell back.

Q. That is, eventually, they got out backwards?

A. Of course I do.

Q. Do you know whether when the seat first broke, it broke backwards? Do you know that?

A. Yes, sir.

    \*        \*        \*        \*        \*

Q. In regard to the way this crossing was made. You say that the stringers were 2x6's?

A. Yes, sir.

Q. You are sure of that?

A. Yes, sir.

Q. How do you know that?

A. I looked at it.

Q. You got out and examined it, did you?

A. Not at that time.

Q. But after that you examined it?

A. Yes, sir.

Q. As I understand you, there was a plank approach on one side?

A. Yes, sir.

Q. That ran from the top of the crossing down to the ground, in a slanting position, did it?

A. I could not say whether it rested on the ground, or not.

Q. It went angling to the ground?

A. It went angling out, yes, sir.

Q. I believe you said there was a low place in the ground, and there was water alongside of the walk?

A. On the north side of the walk there was water stood there.

\*              \*              \*              \*

Q. When was it that you examined it as to these stringers?

A. It was quite a time after that.

\*        \*        \*        \*        \*

Q. What did you examine it for?

A. To see how much of a raise there was.

Q. Did you conclude how much of a raise there was?

A. I did. My judgment would be between six and seven inches.

Q. That is based upon your judgment?

A. Yes, sir.

Q.  You did not take a measure and measure the raise above the ground?

A.  No, sir.

W. A. Reed, sworn and examined as a witness on the part of the plaintiff, testified as follows:

\*          \*          \*          \*          \*

Q.  State whether you examined the street then, and the state of the crossing, and the kind of a crossing it was at this time?

A.  I did look at it, yes, sir.

Q.  State to the jury the condition you found it in then?

A.  The south side was not graded up at all, and the ground 18 or 20 inches from the crossing was as low, if not lower, than the foundation of the crossing itself.

Q.  And how was the street generally below there, was it higher or lower than the foundation of the crossing?

A.  It was certainly not any higher.

Q.  How was it next to the crossing?

A.  There had been a little earth thrown next to the approach board, and I supposed a little earth thrown along between it and the ground.

Q.  What was the thickness of the approach board?

A.  Two inches.

Q.  Thicker than this book, was it? (Shows witness a book.)

A.  Yes, sir.

Q.  The approach board was as thick or thicker than that book, was it?

A.  It was some thicker than that.

Q.  Explain to the jury by this book?

A.  The earth was thrown along here, to fill in from this edge to the ground.  The sills were sloped off to the slope of this plank, and then they made the face of the walk; and when this board was up against that, it did not come to the ground.  Here there had been earth thrown along between the edge of this approach board and the ground.

Q.    How far south of this was the dirt put there?

A.    Certainly not to exceed 18 inches at most, and I think not to exceed a foot.

Q.    You state that before this dirt was banked up here, that this board did not come to the ground?

A.    No, sir, it did not.

Q.    How about the upper edge.    I mean the upper edge of the lower portion of the approach.

A.    The earth came up just about the lower edge, the upper edge of the south edge of the board.

Mrs. E. K. Reed was also sworn and examined as a witness on the part of the plaintiff, and testified that she is the wife of W. A. Reed, the witness last on the stand; that she was living with him at the time the accident occurred; that she was at home and sitting in the north-east room and saw the wagon as it was driven up there.

I quote her testimony:

Q.    When did you first see it?

A.    When it passed to the east of our house.

Q.    How far from the cross-walk was it then?

A.    Well, perhaps 30 feet.

Q.    Well, how was he driving?

A.    On a very slow trot.

Q.    Did you see Mr. Spellman's wagon from that time until the accident occurred?

A.    Well, just while it was passing the north-east corner of the room I did not.

Q.    Did you see it at the time the accident occurred?

A.    Yes, sir, I did.

Q.    State to the jury just what you saw.

A.    I saw them approaching the walk, as they were coming on a very slow trot; and I saw a horseman coming up, and the horses gave a little spring, and threw the ladies out.

Q.    Did you notice how it happened, what caused the fall of the ladies?

A. I saw the horseman come riding up from town, and he struck his horse. I did not hear him speak to the horse; and just as he struck his horse Mr. Spellman's horses gave a spring, and gave the buggy a very severe shock, and the ladies fell out behind.

Charles Spellman, a witness on the part of the plaintiff, was sworn and examined, and testified as follows:

\*     \*     \*     \*     \*     \*

Q. Did you ever see this walk?

A. Yes, sir.

Q. How long after this accident was it?

A. It was the next day.

Q. State to the jury if you examined the walk?

A. I did not closely, I walked over it, and stopped and looked at it. I did not take any measurements.

Q. What was the condition of the street south of it and the approach up to it?

A. There was no approach, only this plank and that lay up to the side. It was never filled any there at all.

Q. How was the street south, was it higher or lower than the street north of the walk?

A. It was lower.

Q. How much lower.

A. Well, I could not say exactly.

William Spellman was also sworn and examined as a witness on the part of the plaintiff, and testified as follows:

Q. Did you ever examine this cross-walk?

A. Not particularly ; I passed over it.

Q. Explain to the jury just how it was?

A. It was a walk made of plank, and there was a plank set up edgewise, about that way, upon the walk. (Witness illustrates with a book.)

Q. How was the approach from the street to this plank that was set up edgewise?

A. It was lower than the walk was, considerably.

Q. How long after the accident was it, that you saw the walk.

A.   I cannot tell exactly; it was not but two or three days.

Q.   Did you examine this plank approach that was up against the walk as to the condition of the lower edges of the approach?

A.   Yes, sir.

Q.   How was it?

A.   Why, it did not come to the ground, that is, it was set on the ground.

Q.   Was there any dirt thrown up underneath it?

A.   No, there was only just the plank on top of the ground.  There was not dirt thrown up on the plank.

Q.   I mean underneath here?   (Shows witness with a book.)

A.   Yes, underneath there was.

Q.   How was it about the upper edge; whether it was covered or exposed?

A.   It was exposed.

George E. Moore, a witness on the part of the plaintiff, testified that he knew the time of the accident, and saw the crossing on the third day after plaintiff was hurt.   I quote:

Q.   You may describe the condition of it as you saw it then?

A.   Well, the way I saw it was a plank sidewalk; the approach of the sidewalk was in that shape (witness illustrates with his hands), just about that shape, with no filling.   I know nothing about it, only as I saw it.

Q.   What height was it from the ground.

A.   Well, I could not tell as to that, for I did not measure it; but I should judge from the looks of it, I should think it was about six inches of a raise.

Q.   Was there any fill on the street south of it?

A.   No, sir.

Q.   To make a grade?

A.   No, sir.

City of York v. Spellman.

Samuel Leavitt, a witness on the part of the plaintiff, testified that he is a son-in-law to the plaintiff; saw the crossing where she was hurt; passed over it almost every day; lived in town; came down to the crossing within an hour; did so in company with plaintiff's husband; don't remember that he made an examination of the condition of the walk at that time, but did soon after. I quote:

Q. Well, how was it as to the approaches from the south side?

A. It was abrupt there, and no dirt, and it was 2x6.

Q. That is, you mean by that, the approach from the south side up against the walk?

A. Yes, sir.

Q. Did you examine to ascertain whether this upper edge of the lower part of the approach was covered or exposed?

A. I do not know that I did. I do not know whether there was any dirt there or not.

Upon his cross-examination, among other things, this witness testified as follows?

Q. How high was the top of the crossing above the level of the ground?

A. If there was no dirt it would be six inches high and the slant would take off a little.

Q. Do you know how much you would take off for slant?

A. No, sir.

Q. Do you know if, for instance, the approach is laid up, slanting up, to come up on the crossing, and that approach is six inches wide; now suppose the approach is six inches wide, and it rests upon the ground at the bottom, and that the top of it is as high as the crossing, and it is laid down so as to make an approach, do you know how much the elevation of the top of the walk would be less than six inches.

A. Not exactly; but I have an idea.

Q.   What is your idea; is it more than two-thirds as much?

A.   It would depend on how much of a slant you would give it and how the crossing was to lean to.

Q.   You do not know, then, how high that crossing was above the level of the ground?

A.   I never measured it.

Q.   Did you say that there was no dirt put up to the foot of the approach ; was there not some dirt put in here, to the foot of the approach, to make a gradual approach to the foot of the approach; was it not a gradual slant from back a foot, or a foot and a half from the foot of the approach?

A.   Think there was a little dirt back there.

Q.   Was there not enough to make a gradual slant from back a foot or eighteen inches up to the foot of the approach?

A.   I do not know.

On the part of the defendant, Henry Seymour testified that he was well acquainted with the cross-walk in question at and about the time of the accident and at the time it was built.   I quote:

Q.   State your facilities for knowing its condition.

A.   I lived one street south and about four or five blocks west of there, and there was no walk on the street that I lived on at that time, and I always went over to this street north and came to town to my business; my business was at the depot at that time and I traveled that street usually not less than once a day ; when it was wet I went that way, and I got in the habit of going that way and I went that way when it was dry.

Q.   Do you remember the time the accident occurred?

A.   I do not remember exact time, but I remember the circumstance.

Q.   State the condition of the walk at that time?

A.   I think there was not much difference in its condi-

tion at that time from its general condition from the time it was built until the time the regular grade was made from this low place north of it.

Q. State to the jury what its height was?

A. I never measured its height, but it was made in the usual manner of making crossings—wooden crossings in this town—I should say either 2x4s or 2x6s, set edgewise, and two-inch plank laid on the top, and the usual approaches.

Q. What width was the approach board?

A. The approach board was a six-inch board or plank and the top was of the same material; at the time the walk was built there was no cuts or grades, and it was made on the level ground; I remember of passing it the day it was built, or the evening that it was built, and there was dirt thrown along each side—fresh dirt—and at that time it came upon the approaches, I should say half way, but the ground being loose it naturally packed and settled away with the rains, so I do not think the dirt was much, if any, above the bottom of the approaches, say after a week or two weeks after it had been put in.

Q. You may state how far the grade extended south of the walk, the dirt that had been thrown up there?

A. I could not state exactly, but it was either hauled or shoveled in.

Q. How far out did it extend?

A. I should think from—well, perhaps in the extreme and perhaps nearer than that; it was not very regular.

Q. You may state about what angle this approach was kept at?

A. I do not know exactly, but I should say it was considerably less than half pitch; it was probably 40 or 45 degrees, or somewhere along there; it was the usual slant for approaches.

Q. You think it was less than half pitch?

A. I think it was less than half pitch; I have also

driven over the walk a good many times; I did business with my team that way; I used to do a little farming at that time, and I used to go that way.

Q. You may state the height of that walk, this cross-walk, from the level of the street?

A. I could not state that particularly.

Q. Give your best judgment.

A. I have already stated how it was built; it was set on the ground, or perhaps set in enough to steady it; I do not think there was anything under these timbers; it must have been from general appearance, never having meas-ured it, but, judging by passing over it hundreds of times, perhaps thousands, since it was built——

Q. I believe you have not stated what its height was at that time above the ground; that is, where the wheels would run on to it from the ground.

A. At no time to my recollection has this ground been below this slanting approach, and the height of this slant-ing approach I could not exactly say; I know it was 2 by 6, just put on there, and the top of that was as high as the top of the walk.

Q. I believe you said that the bottom of this 2 by 6 rested on the ground and that the dirt reached the edge of that approach.

A. When the crossing was first built the loose dirt was put there and came up on this approach; it came up in many places near to the top, and in many places nearly half way, and some places perhaps a very little; I con-sidered it at the time a temporary grade, for if I remem-ber right that crossing was put in about the time it was freezing up, and they did no scraper work on that road that fall.

C. S. Hesser was sworn and examined as a witness on the part of the defendant, and testified at length as to the description and condition of the street and crossing, in which he agreed in all material respects with the last wit-ness. He had never measured the height of the crossing.

Charles Le Count was also sworn as a witness on the part of the defendant. He testified that he resides in the city, and did at the time of the accident; remembers the circumstance. I quote his testimony in part:

Q. Did you know the crossing where the accident took place?

A. Yes, sir.

Q. You may state what opportunities you had for knowing that crossing at that time?

A. I lived where Mr. Hibbard now lives, and I was keeping a hardware store here in town, and I boarded at home, and I passed over this walk six times a day and sometimes more.

Q. Well, now, do you recollect the circumstance of this walk being constructed there?

A. Yes, sir.

Q. How was it constructed?

A. It is made by 2x6s being rested on the ground, and 2x6s put on for the slant.

Q. What was it covered with?

A. It was covered with two-inch plank all through, and then there was some dirt thrown on the plank.

Q. That is, it was thrown in at the foot of the approaches.

A. Yes, sir, and extending back.

Q. How high did the dirt come up as to the approaches?

A. At the time of the accident it might have come up an inch on the approach.

Q. About what was the slant of this approach?

A. Well, I measured it and know exactly.

Q. Then, you know exactly the height of the slant, do you?

A. Yes, sir; I laid a level on the top and measured down with a rule just three and a half inches to the top edge of the approach.

City of York v. Spellman.

Q.   Three and a half inches from what?

A.   From the level of the sidewalk.

Q.   From the level of the sidewalk down to what?

A.   To the level of the approach of wood.

Q.   To the bottom of the approach?

A.   Yes, sir.

Q.   Now, when did you make that measurement?

A.   About a year and a half or two years ago.

Plaintiff moved to strike out the testimony of this witness in relation to the height of the walk, said measurement being made two years after the accident heretofore testified to.   Sustained, and defendant excepts.

Q.   In speaking of this crossing, without regard to the ground, at the time of your measurement how was the crossing nailed together?

A.   It was nailed with spikes.

Q.   I will ask you as to how solid it was nailed together, how strong it was, as to whether it gives any or has at any time given any?

A.   I do not think it has.

Q.   Had it up to this time?

A.   Up to this time, no, sir.

Q.   It is in the same shape as it was then, so far as the timbers are concerned, is it?

A.   Yes, sir.

Defendant's counsel then by interrogations sought to prove by the witness the result of his measurement of the said crossing, but the objection of plaintiff thereto, for the reason that said measurement was made two years after the accident, was sustained and the testimony was ruled out.

There was other testimony which it is not deemed necessary to notice.

The following instructions were given to the jury by the court on its own motion:

" Instructions to jury—

"1.   The plaintiff brings this action to recover the sum

City of York v. Spellman.

of $5,000 for damages she alleges she has sustained by reason of an alleged personal injury received by being thrown violently out of a buggy in which she was riding while said buggy was being driven over and across one of the cross-walks in the city of York, Nebraska, which cross-walk and the street it was across plaintiff claims was at the time by the defendant negligently permitted to be in an improper and unsafe condition for crossing with vehicles.

" 2.  It is for you to determine from the evidence and the facts and circumstances of the case whether or not the cross-walk and street where the alleged injury occurred was at the time in a reasonably safe condition for crossing by vehicles, and whether such condition was the proximate cause of the injury, if any, and whether the plaintiff was guilty or not of contributory negligence.  (Defendant excepts.)

" 3.  You are instructed that the defendant is bound by law to use all reasonable care, caution, and supervision to keep its streets and walks in a reasonably safe condition for travel in the ordinary modes of travel; and if it fails to do so, it is liable for injuries sustained in consequence of such failure, provided the party injured is himself exercising reasonable care and caution ; and the fact that the plaintiff may have in some way contributed to the injury sustained by her, will not prevent her recovering, if by ordinary care she could not have avoided the consequences to herself of the defendant's negligence.  (Defendant excepts.)

" 4.  The jury are instructed that the defendant is not bound to any greater degree of care and diligence than is sufficient to keep its streets and walks in a reasonably safe condition, and if any accident occurs when they are in such reasonably safe condition the defendant is not liable for such accident. ·

" 5.  If you believe from the evidence that the plaintiff was injured, and sustained damages charged in the petition,

and that the injury was the combined result of an accident and of the defective condition of the street and walk, if any is proven, and that the damage would not have been sustained but for the defect, although the primary cause of the injury was a pure accident, still, if the jury believe from the evidence that the plaintiff was guilty of no fault or negligence, and the accident one which common and ordinary prudence on the part of the plaintiff could not have foreseen and provided against, then the city is liable provided the jury believe from the evidence that the city authorities were guilty of negligence in not remedying such defects.    (Defendant excepts.)

" 6.    You are instructed, as a matter of law, though you should find from the evidence that the injury complained of is the combined result of an accident and a defect in the street or walk, yet if you also find, that by the use of ordinary care and prudence on the part of the plaintiff the accident might have been avoided, you must find for the defendant.

" 7.    The jury are further instructed that reasonable care and caution required of the plaintiff as mentioned in these instructions, means that degree of care and caution which might reasonably be expected from an ordinary prudent person, under the circumstances surrounding the plaintiff at the time of the alleged injury.

" 8.    The law is, that the driver of a private conveyance is the agent of the person riding in such conveyance, and if such person while riding along a public street is injured in consequence of the defective and improper condition of the cross-walk, and the driver is guilty of a want of ordinary care and caution, and his negligence materially contributes to such injury, then the person injured cannot recover as against the city for the injury received.

" 9.    The burden of proving negligence rests upon the party alleging it; and where a party charges negligence on the part of another as a cause of action, he must prove

the negligence by a preponderance of the evidence. And in this case, if the jury find that the weight of the evidence is in favor of the defendant, or that it is equally balanced, then the plaintiff cannot recover and the jury should find the issues for the defendant.

"10. The defendant is not required to have cross streets and cross-walks so constructed as to secure immunity in using them; nor is it bound to employ the utmost care and exertion to that end. Its duty under the law is only to see that its cross-walks are reasonably safe for persons exercising ordinary care and caution.

"11. If you find that the seat was improperly fastened to the wagon at the time of the accident, and that the accident would not have occurred but for that fact, then you will find for the defendant.

"12. If you find that the cross-walk in question was in a reasonably good and safe condition under all the circumstances, you will find for the defendant.

"13. The defective condition of the street and cross-walk, if any, must have been the proximate cause of the injury to entitle the plaintiff to recover.

"14. The rule as to proximate cause is this, that when several concurring acts or condition of things, one of them the wrongful act or omission of the defendant, produces the injury, and it would not have been produced but for such wrongful act or omission, such act or omission is the proximate cause of the injury if the injury be one which might reasonably be anticipated as a natural consequence of the act or omission.

"15. If you find for the defendant you will simply return a verdict finding for the defendant.

"16. If the jury believe from the evidence under these instructions that the plaintiff is entitled to recover, then in fixing the damages which she ought to recover you may take into consideration all the circumstances surrounding the case so far as they are shown by the evidence:

such as the circumstances attending the injury; the pain she has suffered, if any; the extent and duration of the injury, and give the plaintiff such damages as you believe from the evidence she has sustained.    (Defendant excepts.)"

Instruction number 1, of instructions prayed by counsel for defendant, the refusal to give which is assigned for error by the plaintiff in error, is not found in the transcript.

I have copied so much of the testimony given on behalf of the plaintiff in the court below as is devoted to the facts and circumstances of the injury to plaintiff and the condition of the street and crossing at the time of the accident; also so much of the testimony offered and given on the part of the defendant as is deemed necessary to show the applicability of the last part of the opinion.    I have also copied the instructions entire for the purpose of showing what was not given as well as what was.

It will be seen from the testimony, that while the shape of the wooden cross-walk with its approaches may have been clearly shown to the trial court and jury by means of the illustrations shown by piling books together, yet it is impossible to test here the correctness of such illustrations, as they could not be preserved in the bill of exceptions.    But, so far as we can understand the testimony as to the elevation of the cross-walk, it was from six to eight inches above the general level of the street.    The top planks were placed on sills placed lengthwise of the street.    These sills were 2x6 pine boards.    The planks of the walk were of the same material and dimensions. There is a conflict of testimony as to whether these sills were or were not set into the ground.    If they were not, the elevation of the cross-walk was eight inches above the general level, yet no witness places it above six or seven inches.    The sills were slanted or beveled off at the ends, and side boards, or as the witnesses call them, approach

boards, were spiked on to the ends, extending from the top of the boards, of the walk towards the ground.   These boards being of the same width as the sills, and necessarily projecting two inches above the top of the sills in order to be even with the upper surface of the walk, and the ends of the sills being cut slanting or beveled they would not quite reach the ground in any event, even if the sills were sunk into the ground as stated by one or more of the witnesses.   This space between the lower edge of these sides, or approach boards, and the general level of the ground was by the great weight of the testimony shown to have been filled in with earth, which extended out at an undefined angle to the general level.

For aught that appears in the testimony, the above is the proper and approved plan for the construction of wooden cross-walks.   Indeed, the only evidence that it is not, if any, is that furnished by the fact of the injury to the defendant in error, which furnished the occasion for this litigation.   It cannot be denied that the force of such evidence is greatly weakened, if not entirely neutralized, by the accompanying evidence of the sudden starting up of the team behind which the injured party was riding just as the vehicle was crossing the walk; and the fact that she, as well as her companions occupying the seat with her, fell backwards, and not forward, from the vehicle. In this connection I refer to instruction number five of the foregoing instructions.   As matter of law I see no objection to this instruction, but to render it applicable there should be evidence outside of and disconnected with the accident itself from which the jury could find " that the city authorities were guilty of negligence in not remedying such defect."   As we have already seen, there was no such evidence.   Had the cross-walk been shown to have been negligently and improperly built, so as to constitute it an unlawful structure, the jury may have found it rather than the sudden springing forward of the team to

have been the proximate cause of the injury; but to say that the defective cross-walk shall be of the two selected as the proximate cause of the injury, because defective cross-walks are evidence of negligence on the part of the city authorities, and then, that this cross-walk was defective because of this injury, is to reason in a circle and cannot be accepted as satisfactory, and such must have been the course of reasoning by which the jury, under the instruction now being considered, found their verdict. I think that the instruction misled them into the belief that there was evidence before them from which they might find that the city authorities were guilty of negligence in not remedying defects in the cross-walk not shown to exist, and hence, was erroneous. The weight of the evidence certainly was as testified to by W. A. Reed, that at the time the cross-walk was constructed there was earth filled in between the lower and outside corner or edge of the approach board and the ground, which earth so filled in extended out from one foot to eighteen inches from the said approach board. There was also some evidence tending to prove that some of this earth had been washed away by rains, leaving the south side of the cross-walk more abrupt at the time of the injury. It is possible that the condition of the walk on the south side may have been such that had the city authorities had notice of such condition, and had for any considerable length of time failed to restore the earth approach, it would have been evidence of negligence on the part of the city "But," says Dillon, "as in such case the *basis of the action is negligence, notice to the corporation of the defect* which caused the injury, or facts from which notice thereof may reasonably be inferred, or proof of circumstances from which it appears that the defect ought to have been known, and remedied by it, is essential to liability." 2 Dillon's Mun. Corp., § 1024.

In the case at bar there was no evidence of notice to the corporation nor of any fact from which such notice might

be inferred. Nor was the defect in the sidewalk, as sworn to by any witness, of such a character as to make it apparent that it ought necessarily to have been known by the city authorities. No reference having been made to the question of notice by the court in any of the instructions, it may be said that it was the duty of the defendant to present an instruction embodying the law on that subject as applicable to the case, and that a failure to do so amounts to a waiver of all objections on that account. This would be true were it not for the consideration that notice to the corporation is an essential ingredient of the cause of action against the defendant. It is a material link in the chain of facts necessary to fasten liability for the injury to the plaintiff upon the city. This indispensable link, then, being wanting, the plaintiff's evidence fails to sustain the verdict against the defendant. No laches on the part of the defendant short of a failure to apply for relief to the appellate court would amount to a waiver of such defect.

Although this opinion has already reached an unusual length, as there must be a new trial, I deem it proper to call attention to the ruling of the court striking out the testimony of the witness Charles LeCount, of the measuring by him of the wooden structure of the cross-walk and the result of such measurement. As we have already seen, the witness Seymour Spellman had sworn that the cause of the injury was the abruptness of the cross-walk, and the witness LeCount testified that at the time of the accident there was dirt thrown on the 2x6 planks, which were "put on for a slant" which dirt "might have come up an inch on the approach, and extended back from the edge of the approach from a foot to eighteen inches." It therefore became, and was, material to show at what angle the said approach board extended down. With that shown in evidence the jury could come to an intelligent conclusion as to whether the abruptness of the face or elevation of the crossing was the proximate cause of the injury or not.

Such being the case, and it being clearly proved that the wood structure of the walk was firmly spiked together and remained so at the time of the measurement, each plank maintaining the same relative position towards the other pieces, I think that the testimony was material and proper, and that to take it away from the jury was error.

The judgment of the district court is reversed and the cause remanded for further proceedings in accordance with law.

REVERSED AND REMANDED.

THE other judges concur.